IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs August 3, 2004

## STATE OF TENNESSEE v. SYREETA PATTERSON

**Direct Appeal from the Criminal Court for Shelby County**
**No. 02-07938    Arthur T. Bennett, Judge**

---

**No. W2004-00075-CCA-R3-CD  - Filed September 14, 2004**

---

The appellant, Syreeta Patterson, pled guilty in the Shelby County Criminal Court to voluntary manslaughter.  Pursuant to a plea agreement, the appellant was sentenced to six years with the manner of service to be determined by the trial court.  Following a hearing, the trial court denied the appellant's request for alternative sentencing, and the appellant timely appealed.  Upon review of the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which GARY R. WADE, P.J., and THOMAS T. WOODALL, J., joined.

Jake Erwin, Memphis, Tennessee, for the appellant, Syreeta Patterson.

Paul G. Summers, Attorney General and Reporter; Michael Markham, Assistant Attorney General; William L. Gibbons, District Attorney General; and Lee Coffee, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

### I.  Factual Background

On October 10, 2002, a Shelby County Grand Jury returned an indictment charging the appellant with second degree murder.  The indictment resulted from the stabbing death of the appellant's boyfriend on June 20, 2002.  On November 4, 2003, the appellant pled guilty to the lesser-included offense of voluntary manslaughter.  The trial court accepted the appellant's plea and sentenced the appellant as a Range I standard offender to six years confinement.  Subsequently, the trial court held a hearing to consider the appellant's request for alternative sentencing.

At the alternative sentencing hearing, the appellant testified that she and the victim had been dating for approximately five years and had two children.  The appellant also had a child from a

previous relationship. On the day prior to the stabbing, the appellant waited at the home of the victim's mother for the victim to arrive home from work. After the victim arrived home, he and the appellant went to visit his cousin who lived nearby. Thereafter, the victim told the appellant that he was going to his mother's house to shower. Later that evening, the appellant telephoned the victim several times at his mother's home to inquire as to when he would be returning to his cousin's house. Each time, the victim told the appellant that he would return shortly. However, the victim never returned. Eventually, the victim's niece, Jessica, informed the appellant that the victim had gone to bed.

At 7:00 a.m. the next morning, the victim telephoned the appellant at his cousin's house and asked her to bring "his red shirt" to his mother's house. The appellant agreed, and she and her children walked to the home of the victim's mother. When they arrived, the appellant observed the victim's ex-girlfriend sitting in a van across the street. The appellant claimed that the woman was staring at her and was holding what appeared to be a butter knife. The appellant entered the house, walked to the victim's bedroom, and confronted the victim about the presence of his ex-girlfriend, asking him, "why did you call me around here if you knew that she was going to be around here . . . ." According to the appellant, the victim began "cussing" her.

The appellant and the victim began arguing, and the victim "mugged" the appellant, which the appellant explained meant that the victim "[t]ook his hand and pushed [her] in [her] face." The appellant knew "the victim was going to fight" because the victim had previously abused her. The appellant testified that she walked to the kitchen, picked up a kitchen knife, and placed the knife in her pocket. She then went outside and sat on the porch. She attempted to telephone her mother to request a ride home, but was unable to reach her. The appellant claimed that she did not leave the victim's mother's house because her children were inside the house.

Shortly thereafter, the victim came outside, "cuss[ing]" and "mug[ging]" the appellant. The appellant "cussed . . . back" and pushed the victim. The victim then pushed the appellant off the porch, and the couple continued fighting in the yard. According to the appellant, as she lay on the ground, the victim kicked her in her side and spit on her. At the time, the appellant was pregnant with the victim's child. The appellant stood, pushed the victim, and told him that she was "tired of [him] treating [her] like . . . a dog." The couple then grabbed each other's shirts. The victim ordered the appellant to release his shirt, but the appellant refused unless the victim released her shirt. The victim struck the appellant in the face, and the appellant stabbed the victim in the chest with the kitchen knife. The appellant testified that when the victim "hit me in my mouth with his fist . . . I just stuck him." She claimed that she stabbed the victim "in the heat of the moment" and "didn't . . . poke him that hard."

After being stabbed, the victim went inside the house, and the appellant followed. Inside the house, the victim was lying on the floor, and the victim's mother was telephoning the police. The appellant testified that she did not know what was going to happen, so she gathered her children and left. As she walked away from the house, she attempted to telephone her mother to request a ride for her and her children. The victim died as a result of the stab wound.

At sentencing, the appellant informed the trial court that she was sorry for her actions, stating, "I hate that it's done because it was somebody that I love, and I got his kids and I have to deal with that everyday." The appellant also apologized to the victim's family. The appellant asked the trial court for alternative sentencing in lieu of incarceration in order to care for her children. She further noted that she had no prior criminal record.

On cross-examination, the appellant conceded that although she was released on bond, her children currently resided with her aunt and were in her care only on weekends. The appellant denied that on the night prior to the offense, she had been angry with the victim for not returning to his cousin's house. The appellant further denied that she repeatedly telephoned the victim at his mother's house or that she told the victim's niece, Jessica, that "[the victim] was either going to come home or [she was] going to come over to [his mother's] house and hit him in the head with a beer bottle or stab him." The appellant claimed that she telephoned only four or five times and that she went to bed after Jessica informed her that the victim was asleep.

The appellant also denied being angry with the victim the next morning when she went to his mother's house. She related that she did not believe that the victim had spent the night with his ex-girlfriend. The appellant claimed that she procured the knife from the kitchen in order to protect her unborn baby. The appellant conceded that when the victim attempted to walk away after kicking her, she chased him and grabbed his shirt. When she refused to release his shirt, he struck her in the face. The appellant denied stabbing the victim because he was leaving her to be with his ex-girlfriend, claiming that she stabbed the victim only after he hit her in the mouth. The appellant acknowledged that she outweighed the victim by one hundred pounds and that she had several opportunities to walk away from the situation.

The victim's mother, Mary Louise Rubbin, testified at the sentencing hearing that she had known the appellant for approximately five years. She related that the appellant and the victim had one child, but that on the day prior to the stabbing the appellant had informed her that the victim was not the father of her unborn baby. Rubbin testified that the victim was a violent man and she had previously observed him hit the appellant. Rubbin reported the abuse to the police and had the victim arrested; however, the appellant refused to press charges.

Rubbin testified that at the time of the stabbing, the appellant and the victim were "broke up." She related that on the morning of the offense, she told the appellant to leave because she "wasn't going to have no fight[ing]." However, the appellant refused to leave. Rubbin denied seeing the victim "mug" the appellant, stating, "I know he pushed her, that's all I seen." In light of her son's death, Rubbin asked the trial court to deny alternative sentencing.

At the conclusion of the testimony and the arguments of counsel, the trial court denied the appellant's request for alternative sentencing and ordered the appellant to serve her six-year sentence in the workhouse. The appellant now brings this appeal challenging the trial court's denial of alternative sentencing.

## II. Analysis

When an appellant challenges the length, range, or manner of service of a sentence, it is the duty of this court to conduct a de novo review with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d) (2003). However, this presumption is "conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). If the record demonstrates that the trial court failed to consider the sentencing principles and the relevant facts and circumstances, review of the sentence will be purely de novo. Id.

In conducting our review, this court must consider (1) the evidence, if any, received at trial and at the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and the arguments of counsel relative to the sentencing alternatives; (4) the nature and characteristics of the offense; (5) any mitigating or enhancement factors; (6) any statements made by the appellant on his own behalf; and (7) the appellant's potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-102, -103, -210 (2003); see also Ashby, 823 S.W.2d at 168. The burden of showing that a sentence was improper is on the appellant. Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments.

Tennessee Code Annotated section 40-35-102(5) provides that only "convicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society, and evincing failure of past efforts at rehabilitation shall be given first priority regarding sentencing involving incarceration." A defendant who does not fall within this class of offenders and who is "an especially mitigated or standard offender convicted of a Class C, D or E felony is presumed to be a favorable candidate for alternative sentencing options." Tenn. Code Ann. § 40-35-102(6). Furthermore, "[t]he trial court must presume that a defendant sentenced to eight years or less and not an offender for whom incarceration is a priority is subject to alternative sentencing and that a sentence other than incarceration would result in successful rehabilitation." State v. Byrd, 861 S.W.2d 377, 379-80 (Tenn. Crim. App. 1993) (citation omitted); see also Tenn. Code Ann. § 40-35-303(a) (2003). However, the presumption of alternative sentencing may be rebutted by "evidence to the contrary." Tenn. Code Ann. § 40-35-102(6); see also State v. Hooper, 29 S.W.3d 1, 5 (Tenn. 2000). Guidance as to what constitutes "evidence to the contrary" is found in Tennessee Code Annotated section 40-35-103(1), which provides for confinement when:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Additionally, "[t]he potential or lack of potential for rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed." Tenn. Code Ann. § 40-35-103(5). A defendant with a long history of criminal conduct and "evincing failure of past efforts at rehabilitation" is presumed unsuitable for alternative sentencing. Tenn. Code Ann. § 40-35-102(5).

In the instant case, the trial court correctly noted that because the appellant was convicted of a Class C felony and sentenced as a Range I standard offender to less than eight years, she was entitled to a presumption in favor of alternative sentencing. The trial court further noted that the appellant had no prior criminal record. However, the trial court denied the appellant's request for alternative sentencing based upon the facts and circumstances surrounding the offense. Specifically, the trial court found that confinement was necessary to avoid depreciating the seriousness of the offense. The trial court also questioned the appellant's credibility, finding that she had been untruthful in her testimony at sentencing.

On appeal, the appellant correctly notes that in denying alternative sentencing based upon the seriousness of the offense, the trial court relied heavily upon the death of the victim, finding, "it's more of a tragedy when it didn't have to happen, and it didn't have to happen in this case. . . . So it's serious and it carries heavy weight when a human being's life is taken . . . ." However, it is well established that the fact that a defendant's conduct resulted in a death, by itself, is not sufficient to warrant a finding that confinement is necessary to avoid depreciating the seriousness of the offense. State v. Bingham, 910 S.W.2d 448, 455 (Tenn. Crim. App. 1995), overruled on other grounds by State v. Hooper, 29 S.W.3d 1 (Tenn. 2000). In order to deny alternative sentencing based upon the need to avoid depreciating the seriousness of the offense, the circumstances surrounding the offense must be "'especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree,' and the nature of the offense must outweigh all factors favoring probation." State v. Fields, 40 S.W.3d 435, 441 (Tenn. 2001). Although the death of the victim was a very serious matter, we are unable to conclude that the circumstances surrounding his death were sufficiently "violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree" to warrant confinement based upon the need to avoid depreciating the seriousness of the offense.

Regardless, the trial court also denied alternative sentencing based upon the appellant's lack of candor with the court, stating, "the Court doesn't grant probation for persons who lie under oath." Specifically, the trial court found that the appellant was untruthful at sentencing when she testified that she had not been angry and upset with the victim, stating that the circumstances surrounding the offense demonstrated the appellant's anger with the victim. The trial court further found that the appellant was untruthful when she testified that she "tapped" the victim with the kitchen knife. At sentencing, the State noted that the victim's stab wound measured 3.3 inches in depth. A defendant's lack of candor and credibility reflects poorly on a defendant's potential for rehabilitation. State v. Nunley, 22 S.W.3d 282, 289 (Tenn. Crim. App. 1999). The trial court is in the best position to assess a defendant's credibility and potential for rehabilitation. Id. The record supports the trial court's findings that the appellant was angry with the victim because of his involvement with his ex-

girlfriend and that the appellant was untruthful when she testified that she "didn't . . . poke him that hard." Accordingly, we conclude that the trial court properly denied alternative sentencing based upon the appellant's lack of candor and credibility with the court.

### III.  Conclusion

Finding no reversible error, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE